# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 11, 2012

## STATE OF TENNESSEE v. GREGORY MOORE

**Appeal from the Criminal Court for Rutherford County**
**No. F-65045      Don R. Ash, Judge**

___

**No. M2012-00528-CCA-R3-CD - Filed September 19, 2012**

___

A Rutherford County Criminal Court jury convicted the defendant, Gregory Moore, of one count of aggravated sexual battery, *see* T.C.A. § 39-13-504(a)(4) (2006), and three counts of soliciting sexual exploitation of a minor, *see id*. § 39-13-529(b)(1),[1] for offenses committed against his seven-year-old step-daughter. The trial court imposed an effective sentence of 13 years' incarceration. On appeal, the defendant challenges the sufficiency of the evidence to support his conviction of aggravated sexual battery and the trial court's imposition of sentences. We discern an anomaly in the judgments for counts three and four requiring correction on remand. We otherwise affirm the judgments of the trial court, as modified.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed as Modified; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Patrick Johnson, Nashville, Tennessee (on appeal); Gerald R. Melton, District Public Defender; and Russell D. Perkins, Assistant Public Defender (at trial), for the appellant, Gregory Moore.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William C. Whitesell, District Attorney General; and Laural A. Hemenway, Assistant District Attorney General, for the appellee, State of Tennessee.

___

[1] The offense proscribed in this subsection is a Class C felony when the victim is "less than thirteen (13) years of age." *See* T.C.A. § 39-13-529(e)(2).

# OPINION

Latisha Moore testified that on June 19, 2010, her then-seven-year-old daughter, S.B.,[2] informed her that her husband, the defendant, had done things of a sexual nature to and in front of S.B. The victim imparted this information late in the evening, after the defendant and Ms. Moore's two younger children had already gone to bed.[3] Ms. Moore said that she became "frantic" and immediately telephoned the defendant's mother, Ruby Holloway, to tell her what the victim had disclosed. She said that, after speaking to Ms. Holloway, she "cried a little bit and had to pull [her]self together. . . . [T]hen [she] took [the victim] to the emergency room."

At the emergency room, Ms. Moore informed personnel that she "need[ed] to have [the victim] checked out to make sure that [the victim had] not been sexually assaulted." Later that night, Ms. Moore returned to her apartment accompanied by Murfreesboro Police Department ("MPD") officers to collect some belongings and her two other children. The defendant remained asleep. She and the children then left to stay with a neighbor.

The following morning, Ms. Moore confronted the defendant with the victim's allegations. She recalled asking why he had harmed their family in such a way and the defendant's telling her repeatedly, "I don't know what you're talking about." Ms. Moore admitted that the confrontation quickly got "out of hand" because, already upset by the allegations, she was angered by the defendant's repeated denials. She admitted that she "cussed" and threatened the defendant. She said that her sister and brother-in-law telephoned the police, who soon arrived to defuse the situation.

Ms. Moore testified that their apartment had three bedrooms and two bathrooms. One bathroom was adjacent to the master bedroom. She said that all of the locks on the doors functioned properly at the time of the offenses. She also explained that she worked during the day while the defendant cared for the children and that the defendant worked the 9:00 p.m. to 7:00 a.m. shift at Walmart.

S.B. testified that on June 19, 2010, she told her mother that the defendant "was doing something that he wasn't supposed to do." At trial, she recounted four separate

---

[2] As is the practice of this court, we will refer to the child victim by her initials.

[3] The two younger children, ages three and five at the time of the offenses, were the defendant's biological children. Although the defendant was not the victim's biological father, witnesses testified that he had been the only father figure in the victim's life, having dated Ms. Moore since the victim's birth. The victim also referred to the defendant as "Daddy."

incidents. S.B. testified that once the defendant asked her to help him clean her sister's area in the bedroom the two girls shared while her younger sister and brother watched television in the living room. She said that the defendant pushed her sister's bed against the locked bedroom door. She testified, "[T]hen he told me to bend over the headboard to reach to get stuff . . . . And he unzipped his pants and rubbed his private on my bottom." S.B. said that she was fully clothed during the incident. She said that she did not see "his private" but that she heard the defendant unzip his pants and felt "his private" touch her bottom. When her brother came to the door and knocked, the defendant quickly stopped. She and the defendant then returned to the living room to watch television.

S.B. testified that, during a second incident, the defendant told her to come to the master bathroom while her siblings watched television in the living room. When she went to the bathroom, the defendant "didn't have nothing on." She recalled, "There was a tissue at the corner of the sink. [The defendant] was rubbing his private with some Vaseline to make some white stuff come out." The victim testified that the defendant said nothing to her during the incident. When she left the bathroom, the defendant took a shower.

S.B. testified that, during a third incident, the defendant "told [her] to come in his room because he had to show [her] something." When she went to the master bedroom, the defendant instructed the victim "to get on the bed." She said, "He went in the bathroom and came out with nothing on. He [] got on the floor and made some white stuff come out." The victim testified that she just sat on the bed during this incident. When she got up from the bed and went to the door to unlock it, the defendant grabbed her leg. The victim testified that she kicked the defendant and left the room.

S.B. also testified regarding a fourth incident when the defendant again called her to the master bedroom. Once more, the defendant walked from the adjacent bathroom without any clothing on. He then went to the bed and masturbated while the victim stood at the side of the bed. Although the defendant asked the victim to take off her clothing, she did not. Afterward, the victim went to check on her siblings while the defendant took a shower.

S.B recalled that the defendant made the victim "pinky promise" that she would not tell her mother after the last incident. The victim testified that she "didn't want to keep it from [her] mom," so she reported the defendant's actions within a few days of the last incident's occurrence. She testified that she later spoke to "Ms. Latoya" about the things she had reported to her mother.

MPD Detective Tannas Knox testified that she responded to a child abuse report at the Middle Tennessee Medical Center Emergency Room ("ER") on June 19, 2010. She arrived at the ER to find Ms. Moore "[v]ery upset, distraught, [and] confused about what

was going on and what she was just told" by the victim. Detective Knox took a report from Ms. Moore, but she did not interview the victim. She explained that forensic interviewers with the Child Advocacy Center ("CAC") typically interviewed child victims. Detective Knox and two other officers accompanied Ms. Moore and the victim to their apartment later that night to retrieve the victim's younger siblings and some belongings. She recalled that the defendant remained asleep while Ms. Moore collected the children. Detective Knox advised Ms. Moore that she would refer the allegations to the Department of Children's Services and that someone from the CAC would interview the victim. Detective Knox testified that she advised Ms. Moore against discussing the allegations with the victim until all of the forensic interviews were completed.

Detective Knox testified that she observed the CAC interview with the victim through an adjacent monitoring room. Several days later, the defendant voluntarily submitted to an interview at the MPD. Detective Knox recalled that Detectives Wayne Lawson and Tommy Roberts conducted the interview of the defendant while she observed in an adjacent room.

MPD Detective Wayne Lawson testified that the defendant seemed uncomfortable discussing the allegations with Detective Knox because she was female, so he and Detective Roberts agreed to interview the defendant. He recalled that the defendant initially denied any inappropriate contact with the victim. Eventually, however, the defendant admitted that the victim had once seen his penis when she accidentally walked into the master bathroom while he was masturbating. The defendant claimed that the lock on the bathroom door was broken. He also claimed that he immediately stopped and that the victim never saw any seminal emission.

MPD Detective Tommy Roberts testified that he assisted Detective Lawson's interview of the defendant. He recalled that the defendant adamantly denied any inappropriate actions with the victim. He said, however, that the defendant eventually said, "'Well, yeah, there was this one time'" and described the victim's walking in on him in the bathroom while he masturbated. The defendant characterized this incident as an "unintentional viewing." Detective Roberts testified that the defendant claimed that the victim's "mother might have put her up to" making the allegations.

Following the conclusion of the State's proof, the trial court granted the defendant's motion for judgment of acquittal with respect to count two of the indictment, which alleged a second instance of aggravated sexual battery.

The defendant's father, James Holloway, testified that the defendant moved to his home after the victim's allegations. Mr. Holloway recalled Ms. Moore's calling their

-4-

home on the night of June 19, 2010. He said that Ms. Moore seemed calm when he answered the telephone but that she began crying while speaking to his wife, Ruby. Mr. Holloway testified that he had not spoken to the victim since the allegations were made. He indicated that he and his wife still saw the two younger children, their natural grandchildren, but Ms. Moore would not allow the victim to visit their home. Mr. Holloway opined that the victim was a good kid but that she would lie "[i]f her momma told her to" lie.

The defendant's mother, Ruby Holloway, testified that Ms. Moore telephoned her on June 19 to tell her about the victim's report. She testified that Ms. Moore told her she intended to take the victim to the emergency room. Ms. Holloway, who is a nurse, told Ms. Moore to keep her informed of the victim's condition. Ms. Holloway testified at trial that she did not telephone the defendant to warn him of the allegations because she did not want to cause any more trouble. The next morning, Ms. Holloway was "a little bit shocked" when she overheard Ms. Moore's threatening the defendant. Like her husband, Ms. Holloway complained that she had not visited the victim, whom she considered her own biological grandchild, since the allegations arose. She acknowledged, however, that the victim would be precluded from visiting her at her home because the defendant now lived with her.

The defendant testified that he awoke on Sunday, June 20, and began cooking lunch for his family, who he thought had gone to church. He became curious later in the morning when his family did not arrive home, so he went to look for his wife and found her and the children at a neighbor's apartment. He recalled that his wife, her sister, and her brother-in-law drove back to the apartment before he could return on foot from the neighbor's apartment. When he returned, his wife had a "little mean look" on her face. He testified that she said, "I ought to kill you." He said he did not understand why his wife was threatening him. He left the apartment to go for a walk and was stopped by two police officers who informed him of the victim's allegations. He later filed a domestic violence report against his wife and moved to the Holloway home.

The defendant claimed that he voluntarily went to the police station because he understood that Detective Knox wanted to speak to him about the domestic violence report. When the interview began, the defendant soon realized that the detectives wanted information about the victim's allegations. The defendant testified that he denied touching the victim sexually but did disclose that the victim had inadvertently seen him masturbating once. He claimed that as soon as the victim walked into the bathroom, he hid himself and instructed the victim to knock on the door before entering. The defendant testified that his wife would ask the victim to say untrue things in order "to get ahead." On cross-examination, however, he admitted that Ms. Moore had received no financial benefit from the victim's allegations. Nevertheless, he claimed the victim was not truthful in her accusations.

-5-

By agreement of the parties, the victim's 40-minute interview at the CAC was played in its entirety for the jury. During the interview, the victim recounted numerous instances of the defendant's masturbating in her presence and reported an additional instance of the defendant's touching her. The victim told the forensic interviewer, Latoya Nelson, that the defendant "did something that he wasn't supposed to do."

In rebuttal, the State presented Latoya Nelson who testified that she conducted the forensic interview of the victim. She reported that she performs approximately 250 interviews each year related to child abuse and child sexual abuse allegations. She said that only members of the investigative team are privy to the contents of a forensic interview.

With this evidence, the jury convicted the defendant of one count of aggravated sexual battery related to the offense of the defendant's rubbing his penis against the victim's bottom and three counts of soliciting sexual exploitation of a minor for the three instances of the defendant's masturbating in front of the victim. At sentencing, the trial court imposed concurrent sentences of nine years' imprisonment for the aggravated sexual battery in count one and for two of the soliciting sexual exploitation of a minor convictions in counts three and four. The trial court then imposed a consecutive sentence of four years' imprisonment for the soliciting sexual exploitation of a minor offense in count five, resulting in a total effective sentence of 13 years' incarceration.

Following the denial of a timely filed motion for new trial, the defendant filed a timely notice of appeal. This case is properly before this court. On appeal, the defendant challenges only the sufficiency of the evidence to support his conviction of aggravated sexual battery and the trial court's sentencing decision. We will review each claim in turn.

We review the defendant's claims of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State

the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Aggravated sexual battery, as relevant to this case, is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] . . . [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate areas of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

In this case, the eight-year-old victim testified that the defendant unzipped his pants and rubbed his penis on her clothed bottom while she leaned over the headboard of her sister's bed. In our view, this evidence sufficiently established the elements of aggravated sexual battery.

Next we will address the defendant's challenge to the trial court's imposition of sentence. The defendant initially contends that the trial court should not have imposed a sentence without the completion of a psychosexual evaluation via Code section 39-13-705. He also argues that the trial court's imposition of sentences is excessive in both length and alignment. The State contends that the defendant waived any argument regarding the absence of a psychosexual evaluation and that the sentencing decision is appropriate.

Regarding the failure to complete a psychosexual evaluation, the record reflects that the parties made efforts to obtain the psychosexual evaluation for over six months following the defendant's conviction. During this time, the trial court held monthly status hearings. At each hearing, the parties indicated their inability to locate a mental health provider willing to perform the evaluation. Finally, in August 2011, the State indicated that someone had been contacted to perform the evaluation. At the October 11, 2011 hearing, however, the State notified the court that the doctor declined to perform the evaluation, citing difficulties in obtaining payment from the State for such evaluations. At that hearing, the trial court decided to impose sentence without the psychosexual evaluation. The defendant conceded at the hearing that there was no other option but to sentence without the evaluation.

The defendant now contends that the trial court should not have sentenced him without the psychosexual evaluation. The State argues that the defendant has waived this claim by acquiescing to sentencing at the October 2011 hearing. The State also contends that the burden to obtain the psychosexual evaluation rested with the defendant.

Code section 39-13-705(a) provides that

> each sex offender who is to be considered for probation or any
> other alternative sentencing shall be required to submit to an
> evaluation for treatment, risk potential, procedures for
> monitoring of behavior to protect victims and potential victims
> . . . .

T.C.A. § 39-13-705(a). The Code further provides that the psychosexual evaluation "shall be included as part of the presentence report and shall be considered by the court in determining the sentencing issues" *related to probation or alternative sentencing. Id.* § 39-13-705(b). Further, the defendant bears the cost of the evaluation "based upon [his or her] ability to pay." *See id.* § 39-13-705(c).

In this case, the defendant's conviction of aggravated sexual battery precluded the trial court's consideration of probation or alternative sentencing. *See* T.C.A. § 40-35-303(a) ("no defendant shall be eligible for probation under this chapter if convicted of a violation of . . . § 39-13-504"). Accordingly, we conclude that the failure to obtain a psychosexual evaluation did not preclude the imposition of sentence in this case.

As to the defendant's challenge to the length and alignment of sentences, when considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration" to the appropriate "factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

> (1) The evidence, if any, received at the trial and the sentencing
> hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

The trial court increased the defendant's sentence lengths one year based upon its finding that "[t]he defendant abused a position of public or private trust" in committing the offenses. *See* T.C.A. § 40-35-114(14). The defendant cared for the victim, his step-daughter, during the day while the victim's mother worked. The victim referred to the defendant as "Daddy" because he was the only father figure she had ever known. The record supports the trial court's application of this enhancement factor. We conclude that the trial court's increase of each sentence one-year above the statutory minimum was appropriate in this case.

As to the defendant's challenge concerning the imposition of consecutive sentences, when a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

-9-

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

The trial court imposed partially consecutive sentences based upon its finding that

[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of

-10-

the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

*See* T.C.A. § 40-35-115(5). Victim impact statements from the victim and her mother reflect that the victim experienced academic difficulties and difficulty trusting others as a result of the offenses committed by the defendant. The record supports the alignment of sentences in this case.

That being said, we do, however, discern an anomaly in the judgments on counts three and four requiring correction on remand. The record reflects that, during a jury charge conference, the trial court expressed concern that the State had not established that the defendant had "command[ed] . . . or caus[ed] [the victim] to engage in sexual activity or simulated sexual activity," a requisite element of the Class B felony counts of soliciting sexual exploitation of a minor. *See* T.C.A. § 39-13-529(a). The State argued that the defendant had commanded the victim to engage in sexual activity by asking her to take off her clothing, with respect to count three, and by asking her to lie on the bed, with respect to count four. The trial court was unpersuaded by this argument, so the State then volunteered to amend the indictment to reduce counts three and four to Class C felonies, requiring only proof that the defendant "[e]ngag[ed] in sexual activity . . . for the purpose of having [the victim] view the sexual activity." *See id.* § 39-13-529(b)(1). The record reflects that the defendant consented to the amendment. *See* Tenn. R. Crim. P. 7(b)(1). At sentencing, however, the trial court imposed nine-year sentences for the convictions in counts three and four – apt for Class B felony convictions, not Class C felonies. The record also contains amended judgments concerning these counts. The amended judgments, however, also indicate convictions of Class B felonies and nine-year sentences and are, in all respects, identical to the originally entered judgments. Accordingly, on remand, we direct the trial court to enter corrected judgments in counts three and four appropriately indicating the defendant's convictions of Class C felony soliciting sexual exploitation of a minor offenses, consistent with the amendment agreed to by the parties, and the imposition of four-year sentences on those counts.[4] The effective sentence of 13 years' incarceration, however, is unaffected by this correction.

*Conclusion*

The trial court's judgments are affirmed as modified. On remand, the court shall correct the judgments consistent with this court's opinion to reflect the agreed

---

[4] We acknowledge that the record does not contain the trial court's jury instructions. From our review of the State's closing argument, however, we discern that the State relied only on the elements of soliciting sexual exploitation of a minor as proscribed in Code section 39-13-529(b)(1), a Class C felony.

amendment to the indictment relative to counts three and four.

_____
JAMES CURWOOD WITT, JR., JUDGE